CLARENCE HARKLESS ET AL. *v.* AUDREY ROWE, COMMISSIONER OF INCOME MAINTENANCE, ET AL. (15061)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js.

Argued January 10—decision released April 11, 1995

*Gregory T. D'Auria*, assistant attorney general, with whom were *Christopher P. Hankins*, and, on the brief, *Richard Blumenthal*, attorney general, and *Hugh Barber*, assistant attorney general, for the appellants (defendants).

*Shirley Bergert*, with whom was *Garrett H. Tuller*, for the appellees (plaintiffs).

PETERS, C. J. The dispositive issue in these consolidated appeals is whether, without notice, general assistance recipients may be denied three month "extensions" of benefits merely because they previously have been suspended from the general assistance program. The plaintiffs, Clarence Harkless, Michelle Lawson and Rufino Pabon, are general assistance recipients who reside in the city of Meriden. The defendant Ann Whit-

ney, director of social services (director) for the city of Meriden, denied each of the plaintiffs a three month extension of general assistance benefits pursuant to General Statutes § 17b-118,[1] and a hearing officer appointed by the defendant Audrey Rowe, commissioner of income maintenance[2] (commissioner),

[1] General Statutes § 17b-118 provides: "(FORMERLY SEC. 17-273b). LIMITATIONS ON ASSISTANCE TO EMPLOYABLE PERSONS. REGULATIONS. No assistance or care shall be given under sections 17b-19, 17b-115 to 17b-133, inclusive, 17b-259, 17b-263 and 17b-689 to 17b-693, inclusive, to an employable person who has not registered with the nearest local employment agency of the labor department, has refused to accept a position for which he is fitted and which he is able to accept, or has refused to participate or wilfully failed to report for work in a work program or training or education program, pursuant to section 17b-689, by the town liable to support such person in accordance with sections 17b-116 and 17b-134. The provisions of this section shall not apply to any person who cannot register with such employment agency because of being over sixty-five years of age, health or other disability as determined by the commissioner. On and after July 1, 1992, financial assistance granted under sections 17b-19, 17b-63 to 17b-65, inclusive, 17b-115 to 17b-138, inclusive, 17b-220 to 17b-250, inclusive, 17b-256, 17b-259, 17b-263, 17b-287, 17b-340 to 17b-350, inclusive, 17b-689 to 17b-693, inclusive, and 17b-743 to 17b-747, inclusive, to an employable person shall be limited to no more than nine months in a twelve-month period. A town may extend the period during which assistance is granted by up to three months for recipients who are in compliance with program requirements. A person determined to be unemployable who is subsequently determined to be employable shall be eligible for the assistance provided to an employable person under the general assistance program from the date he is determined employable. Persons with dependent children under eighteen years of age eligible for assistance under sections 17b-19, 17b-63 to 17b-65, inclusive, 17b-115 to 17b-138, inclusive, 17b-220 to 17b-250, inclusive, 17b-256, 17b-259, 17b-263, 17b-287, 17b-340 to 17b-350, inclusive, 17b-689 to 17b-693, inclusive, and 17b-743 to 17b-747, inclusive, shall not be subject to the nine-month durational limit on assistance established pursuant to this section. The commissioner of social services shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section."

All the briefs and records in this case refer to section numbers contained in General Statutes (Rev. to 1993). For ease of future reference, however, we use the section numbers contained in General Statutes (Rev. to 1995). There are no relevant substantive differences between the two revisions.

[2] On July 1, 1993, the department of income maintenance was replaced by the department of social services. See Public Acts 1993, No. 93-262.

affirmed the denial of these benefits. See General Statutes §§ 17b-64, 17b-65.[3] The plaintiffs filed separate administrative appeals from the decisions of the hearing officer to the trial court, which reversed the decisions and remanded the cases to the commissioner for further proceedings. The defendants appealed from the judgments of the trial court to the Appellate Court, and we consolidated and transferred the appeals to this

[3] General Statutes § 17b-64 provides: "(FORMERLY SEC. 17-292e). PROCEDURE FOR FAIR HEARINGS BY COMMISSIONER. (a) An aggrieved person, or the conservator of such person on his behalf, authorized by law to request a fair hearing to review a decision of a public welfare official may make a signed application for such hearing to the commissioner and shall state in such application why he claims to be aggrieved. Such application shall be mailed to the commissioner within ten days of such decision. Within fifteen days after receipt of an application to review a decision of a public welfare official, or within four business days if the application concerns a decision on an application for assistance, the commissioner shall hold a fair hearing at a location convenient to the person requesting the hearing.

"(b) At least seven days prior to the date of such hearing, the commissioner shall mail a notice to such aggrieved person, giving the time and place of the hearing. If the hearing concerns a decision on an application for assistance, the commissioner shall make all reasonable efforts to provide notice of the time and place of the hearing to such aggrieved person at least one business day before the hearing. A reasonable period of continuance may be granted for good cause. The aggrieved person shall appear personally at the hearing, unless his physical or mental condition precludes appearing in person, and may be represented by an attorney or other authorized representative. A stenographic or mechanical record shall be made of each hearing, but need not be transcribed unless (1) an appeal from the decision of the hearing officer is made or (2) a copy is requested by the aggrieved person, in either of which cases it shall be furnished by the commissioner of social services without charge. The commissioner of social services and any person authorized by him to conduct any hearing under the provisions of this section shall have power to administer oaths and take testimony under oath relative to the matter of the hearing and may subpoena witnesses and require the production of records, papers and documents pertinent to such hearing. No witness under subpoena authorized to be issued by the provisions of this section shall be excused from testifying or from producing records, papers or documents on the ground that such testimony or the production of such records or other documentary evidence would tend to incriminate him, but such evidence or the records or papers so produced shall not be used in any criminal proceeding against him. If any person disobeys such process or, having appeared in obedience

court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). Although we affirm the judgments of the trial court remanding these cases to the commissioner for further proceedings, we do so for reasons not provided by the trial court and we remand for a different inquiry than the trial court ordered.

The record reveals the following facts. Each of the plaintiffs was impoverished, had been classified by the

thereto, refuses to answer any pertinent question put to him by the commissioner or his authorized agent or to produce any records and papers pursuant thereto, the commissioner or his agent may apply to the superior court for the judicial district of Hartford-New Britain or for the judicial district wherein the person resides, or to any judge of said court if the same is not in session, setting forth such disobedience to process or refusal to answer. Said court or such judge shall cite such person to appear before said court or such judge to answer such question or to produce such records and papers and, upon his refusal to do so, shall commit such person to a community correctional center until he testifies, but not for a longer period than sixty days. Notwithstanding the serving of the term of such commitment by any person, the commissioner or his agent may proceed with such inquiry and examination as if the witness had not previously been called upon to testify. Officers who serve subpoenas issued by the commissioner or under his authority and witnesses attending hearings conducted by him hereunder shall receive like fees and compensation as officers and witnesses in the courts of this state to be paid on vouchers of the commissioner on order of the comptroller."

General Statutes § 17b-65 provides in relevant part: "(FORMERLY SEC. 17-292f). DECISION. APPEAL. (a) Not later than fifteen days after such hearing, or three business days if the hearing concerns a decision on an application for assistance, the commissioner or his designated hearing officer shall render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy. Such final decision shall supersede the decision made without a hearing. Notice of such final decision shall be given to the aggrieved person by mailing him a copy thereof within one business day of its rendition and if the final decision concerns an application for assistance, the commissioner shall make all reasonable efforts to provide notice to the aggrieved person within such time. Such decision after hearing shall be final except that the applicant for such hearing, if aggrieved, may appeal therefrom in accordance with section 4-183. Appeals from decisions of said commissioner shall be privileged cases to be heard by the court as soon after the return day as shall be practicable."

commissioner as "employable" and began receiving general assistance benefits on or before July 1, 1992. In late 1992 or early 1993, after determining that each plaintiff had failed to complete his or her workfare requirement, the commissioner suspended each plaintiff's general assistance benefits for ninety days.[4] See General Statutes § 17b-689 (a).[5] None of the plaintiffs brought a timely challenge to his or her ninety day suspension.

---

[4] Harkless' benefits were suspended for ninety days beginning August 13, 1992, Lawson's benefits were suspended for ninety days beginning August 21, 1992, and Pabon's benefits were suspended for ninety days beginning February 2, 1993.

[5] General Statutes § 17b-689 provides in relevant part: "(FORMERLY SEC. 17-281a). SUPPORTED WORK, EDUCATION AND TRAINING PROGRAMS. 'EMPLOYABLE PERSON' AND 'UNEMPLOYABLE PERSON' DEFINED. REGULATIONS. EMPLOYABILITY PLANS. (a) As hereinafter provided, each town shall establish a work program which shall include work, work training or work readiness experience and may include substance abuse counseling for persons dependent on drugs and alcohol who are participating in such program. Except as provided in subsection (f), employable persons otherwise eligible for support, pursuant to sections 17b-116 and 17b-134, from any town shall be required to perform such work or participate in such program as may be assigned to them by the public welfare official of the town granting such support or to participate in an education or training program under section 31-3d or any other training or education program approved by the labor commissioner. The public welfare official shall assign to such work as is available in connection with the affairs of state or town government or to public work programs established by the commissioner of social services, as approved by the labor commissioner, including the performance of work in the operation of or in an activity of a nonprofit agency or institution, as defined in Subsection (c) (3) of Section 501 of the United States Internal Revenue Code pursuant to a contract with a town, or to a private employer training program under section 17b-691, or to education or training, employable recipients of support provided such official is satisfied that such persons will not be used to replace, or to perform any work ordinarily performed by, regular employees of any department or other unit of a town or the state, or to replace, or to perform any work ordinarily performed for a town or the state by, craft or trade in private employment. Participation in an education, rehabilitation or training program not part of a work program may be deemed participation in a work program if approved by the commissioner of social services. The number of hours of work to be required of each such person, except a person participating in a private employer training program under section 17b-691, shall be determined by

After each plaintiff's ninety day suspension pursuant to § 17b-689 (a) had expired, the director informed each plaintiff that he or she also would be denied a three month extension of general assistance benefits pursuant to § 17b-118.[6] Each plaintiff timely petitioned for

the amount of the budget deficit of such person and his family. A person participating in a program pursuant to section 17b-691 shall receive wages in accordance with the provisions of that section. No such person, except a person participating in a private employer training program under section 17b-691, shall be required to work for more than the number of hours necessary to earn such amount or be paid more than such amount or less than the minimum hourly wage, pursuant to section 31-58, and no such person shall be required to work or attend training for more than eight hours in a day or more than forty hours in a week. In addition, each person in the workfare program may be required to attend substance abuse counseling. Any such person shall be liable for reimbursements for grants of support only to the extent of the excess of such grants over and above the work performed. Any such person who refuses or wilfully fails to report for work or to participate in an education or training program or substance abuse counseling to which he is assigned by the public welfare official shall be ineligible for assistance for ninety days. An employable general assistance recipient who (1) refuses to cooperate with the town in developing or carrying out his employability plan; (2) fails to accept employment without just cause when offered; or (3) accepts employment and subsequently quits his job voluntarily and without sufficient cause or is discharged for cause as set forth in subdivision (2) of subsection (a) of section 31-236 shall be ineligible for assistance for ninety days. Such a period of ineligibility shall commence on the day immediately following the actual date of termination. . . .

"(c) For the purposes of this section and sections 17b-63, 17b-118, 17b-134 and section 17b-690, an 'employable person' means one (1) who is sixteen years of age or older but less than sixty-five years of age; (2) who has no documented physical or mental impairment or who has such an impairment which is expected to last less than six months, as determined by the commissioner, prohibiting him from working or participating in an education, training or other work-readiness program; (3) who is required to register with the labor department, pursuant to section 17b-118; and (4) who is not in full-time attendance in high school. . . . A person who is a substance abuser without additional health problems or barriers to employment shall be deemed employable, but not job-ready. Such a person shall be required to participate in treatment, including counseling, as part of his employability plan and shall be eligible for assistance while waiting for treatment."

[6] The notice to Lawson, dated March 22, 1993, stated that benefits would not be extended for the three month period beginning April 1, 1993. The notice to Pabon, dated May 7, 1993, stated that benefits would not be

review of the director's decisions in a municipal fair hearing; see General Statutes § 17b-63;[7] and, thereafter, in a state fair hearing. See General Statutes § 17b-64.

At the state fair hearings, the director contended that the applicable regulations automatically made all the plaintiffs ineligible for the three month extension of benefits, because each of them had been "suspended from Workfare . . . during his/her [previous] nine months on assistance . . . ." Regs., Conn. State Agencies § 17-3a-20 (K) (8) (a) (General Assistance

extended for the three month period that had begun May 3, 1993. The notice to Harkless, dated March 17, 1993, did not specify the period in which benefits would not be provided. Both Lawson's and Pabon's notices stated that the benefits would not be extended because of, inter alia, a suspension during the previous nine month period. Harkless' notice stated that his benefits would not be extended because the director had "received a call from [Veterans Memorial Medical Center] and was told that you [Harkless] did not comply with the treatment program that you were in. . . ."

[7] General Statutes § 17b-63 provides in relevant part: "(FORMERLY SEC. 17-292d). FAIR HEARINGS. APPLICATION. (a) Any person whose application for assistance under sections 17b-116 and 17b-134 is rejected or whose receipt of such assistance is terminated or modified, except as provided in subsection (c) of this section, shall have the right to a fair hearing to review such decision in accordance with sections 17b-64 and 17b-65, provided that the town has held a hearing in accordance with this section. Any such person shall be notified in writing immediately of a rejection, termination or modification of such assistance and of the right to such hearings.

"(b) Within ten working days of an action to reject, terminate or modify his assistance, except as provided in subsection (c) of this section, a person may make a signed application requesting a hearing held by the public welfare official. Within three working days after receipt of such application for a hearing concerning a decision on an application for assistance and within seven working days after receipt of such application for a hearing concerning a decision on matters other than an application for assistance, the public welfare official shall hold such hearing. Within three days after the hearing, the public welfare official shall render a decision based solely upon all the evidence introduced at the hearing and the application of all pertinent provisions of law, regulation and state policy. Notice of the decision shall be mailed to the aggrieved person within three days of its rendition."

Policy Manual [1993 Ed.] c. I, § X [K] [8] [a]).[8] In response, the plaintiffs argued that, notwithstanding their previous suspensions and the director's interpretation of the regulations, they remained eligible for the extensions pursuant to § 17b-118 itself. According to the plaintiffs, § 17b-118 made them eligible for extensions as long as they were "in compliance with program requirements," and they in fact were "in compliance

---

[8] Section 17-3a-20 (K) of the Regulations of Connecticut State Agencies (General Assistance Policy Manual [1993 Ed.] c. I, § X [K]) provides in relevant part: "DURATIONAL LIMITS FOR EMPLOYABLE SINGLE RECIPIENTS

"Employable recipients of General Assistance are subject to durational limits on eligibility. Such recipients are eligible to receive state-reimbursed financial assistance for *nine out of twelve months*, with a possible three-month extension.

"Each town reserves the right to grant the three-month extension.

"If a town chooses to fund additional aid to its employable recipients, the town will uniformly apply the criteria set-forth in subsections 7. and 8. in each and every case.

"Each town must inform the Department of Income Maintenance of its intentions to offer the extension to its recipients on the W-15, Comprehensive Town Plan.

"1. The . . . [nine month period begins] with the month the person first received General Assistance financial aid, starting any time *after* July 1, 1992. . . .

\* \* \*

"7. A town may opt to extend fund assistance for up to three additional months to employables who, during their nine months of assistance, have demonstrated a good-faith effort to comply with all eligibility requirements. This may mean a number of things:

"a. The recipient kept all redetermination and other eligibility appointments as required (or was excused for good cause for failing to do so); and

"b. The recipient was cooperative in providing all documentation required to determine and maintain his/her eligibility on a timely basis; and

"c. The recipient:

"(1) Participated in Workfare, as required, and

"(2) Cooperated in developing, and participated in, his/her case management plan, and

"(3) Provided verification of job search activities, as required, and

"(4) Maintained active, satisfactory registration with the job service.

"8. A recipient would be ineligible for the extension if he/she:

"a. Was suspended from Workfare at any time during his/her nine months on assistance; or

with program requirements" under the statute because they never had "wilfully failed to report for work." See General Statutes § 17b-118. Indeed, the plaintiffs argued, because they had not "wilfully failed to report for work," the suspensions themselves had been improper. See General Statutes § 17b-689 (a). Each plaintiff then testified as to the allegedly nonwilful reason why he or she had failed to complete the workfare requirement.[9]

---

"b. Failed to cooperate and/or participate in his/her case management plan; or

"c. Was repeatedly uncooperative in keeping appointments, providing requested documentation, including medical documentation, or complying with other program eligibility requirements; or

"d. Assaulted or threatened the safety of General Assistance staff or other persons in the office (a complaint must have been filed with the police); or

"e. Was convicted of General Assistance fraud during the nine-month period; or

"f. Acknowledged receipt of assistance improperly obtained during the nine-month period; or

"g. Was discontinued from General Assistance because of finding employment, and subsequently quit (without good cause) or was fired (for cause) from that job; or

"h. Refused, without good cause, to accept a job that was offered.

"9. The duration of the extension (which may be up to three months) should be determined by the facts of the individual case. It should continue only as long as needed, provided the person remains eligible, for a maximum of three months. [F]or example, a person may only need the extension for one month, pending receipt of wages from a new job.

"10. The town's right to discontinue an employable person after nine months may not be disputed at a hearing if it is not the town's policy to ever g[r]ant such extensions. However, a recipient may request a hearing provided the town routinely offers the extension to its recipients if he/she disagrees with the basis on which the town declined to grant the extension. For example, a town may propose to discontinue assistance because the recipient failed to complete a Workfare assignment; the recipient may dispute this rationale, pointing out that his/her suspension was not upheld at a local-level or State Fair Hearing." (Emphasis in original.)

[9] Harkless testified that, during the relevant time period, he had been unable to work because of medical problems. Lawson testified that, during the relevant time period, she had been living in the state of Delaware. Pabon testified that during the relevant time period, he had believed that he had completed his workfare requirement.

Without deciding whether the regulations conflicted with the statute, and without evaluating either the credibility or the sufficiency of the plaintiffs' testimony, the state fair hearing officer affirmed the denials of the extensions. The hearing officer ruled that the time for contesting the propriety of the suspensions had expired and that, on the basis of the unchallenged suspensions and the regulations, the plaintiffs were ineligible per se for the three month extensions.

The trial court reversed the decisions of the state fair hearing officer. The court first held that a state fair hearing is "a de novo proceeding" and that the hearing officer is required by § 17b-65 to " 'render a final decision based upon all the evidence introduced before him . . . .' " Quoting our opinion in *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 536, 525 A.2d 940 (1987), the court further held that " '[d]ue process of law requires . . . that at [a] hearing the parties involved have a right to produce relevant evidence . . . .' " The court concluded, therefore, that "the fair hearing officer's refusal to consider [each] plaintiff's evidence concerning the validity of the previous suspension of his [or her general assistance] benefits constituted an abuse of discretion by the hearing officer and a violation of the plaintiff's due process rights." The court accordingly rendered judgments remanding each case to the commissioner "for a new decision by the hearing officer, based on all the evidence in the record, including evidence concerning the validity of the suspension of the plaintiff's General Assistance benefits."

In these consolidated appeals, the defendants contend that, pursuant to the governing regulations, the only "relevant evidence" in a state fair hearing reviewing the denial of an extension is the fact of an unchallenged suspension, and not whether the recipient *actually* "wilfully [had] failed to report for work"; Gen-

eral Statutes § 17b-118; before the suspension was imposed. Urging affirmance of the trial court judgments, the plaintiffs respond that the regulations: (1) are inconsistent with § 17b-118; and (2) deprive the plaintiffs of property without due process of law. The plaintiffs further argue that, in the circumstances of these cases, the suspensions could not be used to justify the denials of the extensions, because, at the time of the suspensions, the commissioner had not notified the plaintiffs either of their rights to challenge the suspensions or of the fact that, if the suspensions went unchallenged, the plaintiffs later would be ineligible for the extensions.[10]

We conclude that each trial court judgment ordering a remand must be affirmed, but for different reasons than the trial court provided, and for a different inquiry than the trial court ordered. We disagree with the trial court's implicit holding that, whenever a general assistance recipient is denied an extension on the basis of a previous suspension, a hearing officer always must consider the recipient's evidence that the previous suspension should not have been imposed. We further conclude, however, that in the circumstances of these cases, the defendants' decision to deny the extensions based solely on the previous suspensions may have deprived the plaintiffs of property rights without due process of law. A remand to resolve this issue is, therefore, required.

I

We first consider the disagreement among the parties and the trial court about the relationship between the regulations and the underlying statutes. The defendants maintain that the underlying statutes pro-

---

[10] Neither the municipal fair hearing officer, the state fair hearing officer nor the trial court made any findings of fact as to whether the plaintiffs were provided such notice.

vide ample authority for the commissioner's promulgation of § 17-3a-20 (K) (8) (a) of the Regulations of Connecticut State Agencies (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [8] [a]). The plaintiffs argue that the regulation is inconsistent with § 17b-118, while the trial court concluded that the regulation is inconsistent with § 17b-65. According to the plaintiffs, § 17b-118 makes recipients eligible for extensions whenever they are "in compliance with program requirements" and, in deciding whether a recipient is "in compliance with program requirements," the defendants must decide not only whether an individual has been suspended, but whether he actually "wilfully failed to report for work." General Statutes § 17b-118. According to the trial court, § 17b-65 required the hearing officer to consider the plaintiffs' reasons for failing to work because that statute provides that the "hearing officer shall render a final decision based upon all the evidence introduced before him . . . ." We agree with the defendants that the regulation is consistent with both statutes.

We first address whether the regulation conflicts with § 17b-118. The plaintiffs' argument to that effect depends upon two unstated premises. First, the plaintiffs assume that, in making "compliance with program requirements" a *prerequisite* to eligibility, § 17b-118 makes "compliance with program requirements" the *only* criterion for eligibility. Second, the plaintiffs assume that "compliance with program requirements" means *only* compliance with the requirements specified in § 17b-118.

The plaintiffs provide, and we can find, no support for these premises in the text of § 17b-118. Indeed, the language of that statute supports the argument of the defendants that the commissioner does have discretion to create her own eligibility criteria for extensions. Section 17b-118 nowhere mandates that "compliance with

program requirements" is the only eligibility criterion. The section also contains no all-inclusive definition of the term "program requirements." Most importantly, the statute contains an express provision that "[t]he commissioner of social services shall adopt regulations . . . to implement the provisions of this section."

Furthermore, even if the plaintiffs' premises were correct, there would be no textual inconsistency between the statute and the regulation at issue.[11] The regulation provides that "[a] recipient would be ineligible for the extension if he/she . . . [w]as suspended from Workfare at any time during his/her nine months on assistance . . . ." Regs., Conn. State Agencies § 17-3a-20 (K) (8) (a) (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [8] [a]). In adopting the regulation, the commissioner reasonably could have concluded that a recipient who had been "suspended from Workfare" was not "in compliance with program requirements" set out in § 17b-118. General assistance recipients may be "suspended from Workfare" only pursuant to § 17b-689, and that section allows suspensions only for violations of identical or substantially similar "program requirements" that make recipients ineligible for extensions under § 17b-118. See footnotes 1 and 5.

The plaintiffs' argument thus devolves into the assertion that § 17b-118 requires an *independent inquiry* into whether the recipient actually has failed to comply with program requirements and prohibits the defendants

[11] Because this case concerns only the validity of § 17-3a-20 (K) (8) (a) of the Regulations of Connecticut State Agencies (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [8] [a]) (recipient ineligible for extension if previously suspended from workfare), we need not consider whether, if the plaintiffs' premises were correct, the other regulations in § 17-3a-20 (K) (7) through (8) of the Regulations of Connecticut State Agencies (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [7] through [8]), would be valid.

from relying on the fact of a previous, unchallenged suspension to justify the denial of an extension. We are unpersuaded.

A suspended recipient is entitled to challenge a suspension by proving that he or she has not violated any "program requirement" at the time the suspension is imposed. See General Statutes § 17b-64; Regs., Conn. State Agencies § 17-3a-23 (E) (7) (General Assistance Policy Manual [1993 Ed.] c. I, § XIII [E] [7]). Although the general assistance statutes are remedial and therefore must be given a liberal construction in favor of those whom the legislature intended to benefit; see *Tianti* v. *William Raveis Real Estate, Inc.*, 231 Conn. 690, 696, 651 A.2d 1286 (1995); nothing in the statutes or the legislative history suggests that a recipient should have more than one opportunity to demonstrate "compliance with program requirements." Indeed, both the statute and the legislative history support "the position that the regulation is consistent with the general statutory scheme that the regulation was designed to implement. *Texaco Refining & Marketing Co.* v. *Commissioner*, 202 Conn. 583, 600, 522 A.2d 771 (1987); see also *Phelps Dodge Copper Products Co.* v. *Groppo*, 204 Conn. 122, 129–30, 527 A.2d 672 (1987); *Connecticut Hospital Assn., Inc.* v. *Commission on Hospitals & Health Care*, 200 Conn. 133, 144, 509 A.2d 1050 (1986)." (Internal quotation marks omitted.) *Caldor, Inc.* v. *Heslin*, 215 Conn. 590, 599, 577 A.2d 1009 (1990), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991). The legislature expressly conferred on the commissioner broad discretion to "adopt regulations . . . to implement the provisions of this section"; General Statutes § 17b-118; see also *General Accident Ins. Co.* v. *Wheeler*, 221 Conn. 206, 211, 603 A.2d 385 (1992); and the legislative review committee subsequently approved the regulation at issue here pur-

suant to General Statutes § 4-170.[12] See *Caldor, Inc.* v. *Heslin,* supra, 598–99.

Having concluded that the challenged regulation is consistent with § 17b-118, we now turn to address the trial court's conclusion that § 17b-65 required the defendants to consider the evidence that the plaintiffs proffered at their state fair hearings. We agree with the trial court that § 17b-65 (a) required the state fair hearing officer to "render a final decision based upon all the evidence introduced before him and applying all pertinent provisions of law, regulations and departmental policy." This statute, however, did not require the hearing officer to consider evidence that was irrelevant to the substantive issue that he or she was called upon to decide, pursuant to the "pertinent provisions of law,

---

[12] General Statutes § 4-170 provides in relevant part: "LEGISLATIVE REGULATION REVIEW COMMITTEE. FILING REQUIREMENTS FOR REGULATIONS. FISCAL NOTES REQUIRED. (a) There shall be a standing legislative committee to review all regulations of the several state departments and agencies following the proposal thereof, which shall consist of eight members of the house of representatives, four from each major party, to be appointed on the first Wednesday after the first Monday in January in the odd-numbered years, by the speaker of said house, and six members of the senate, three from each major party, to be appointed on or before said dates by the president pro tempore of the senate. . . .

"(b) No adoption, amendment or repeal of any regulation, except a regulation issued pursuant to subsection (f) of section 4-168, shall be effective until the original of the proposed regulation approved by the attorney general, as provided in section 4-169, and seventeen copies thereof have been submitted to the standing legislative regulation review committee at the designated office of the committee by the agency proposing the regulation and the regulation has been approved by the committee, at a regular meeting or a special meeting called for the purpose, and filed in the office of the secretary of the state by the agency, as provided in section 4-172. . . .

"(c) The committee shall review all proposed regulations and, in its discretion, may hold public hearings thereon, and may approve, disapprove or reject without prejudice, in whole or in part, any such regulation. If the committee fails to so approve, disapprove or reject without prejudice a proposed regulation, within sixty-five days after the date of submission as provided in subsection (b), the committee shall be deemed to have approved the proposed regulation for purposes of this section."

regulations and departmental policy." Because valid regulations provide that individuals who have been suspended are ineligible for extensions, the only relevant facts in the state fair hearings were that the plaintiffs had been suspended, and that the suspensions had not been overturned on appeal. See Regs., Conn. State Agencies § 17-3a-20 (K) (8) and (10) (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [8] and [10]). The plaintiffs' reasons for failing to work were inapposite to a determination of whether, pursuant to the regulations, the extensions properly had been denied.[13] Accordingly, we reject the statutory basis upon which the trial court ordered a remand for further proceedings before the fair hearing officers.

## II

We must next decide whether constitutional constraints arising under the federal due process clause[14] require further evidentiary inquiries, even if such inquiries are not mandated by the applicable regulation and statutes. The plaintiffs argue, and the trial court held, that procedural due process required the defendants to consider the evidence that the plaintiffs had proffered at their state fair hearings. Although we reject the due process analysis provided by the trial court, we conclude that, because the record is incomplete, we cannot resolve all of the plaintiffs' due process claims.

---

[13] The state hearing officer was not required to consider the plaintiffs' evidence even if, as the trial court held, state fair hearings on the denial of the extensions are "de novo" proceedings. In a "de novo" proceeding, a trier of fact may not "consider or adjudicate issues beyond the scope of those proper for determination by the order or decree attacked." *Appeal of Stevens from Probate*, 157 Conn. 576, 581, 255 A.2d 632 (1969).

[14] The fourteenth amendment to the United States constitution provides in relevant part that "[n]o State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." The plaintiffs make no claims under the independent due process guarantees of our state constitution.

The trial court's due process analysis was based on this court's opinion in *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 536. In that case, we held that " '[d]ue process of law requires . . . that at [a] hearing the parties involved have a right to produce relevant evidence . . . .' " Id. As we already have explained, the plaintiffs' evidence was irrelevant under the governing regulations. Therefore, nothing in *Huck* required the evidence to be considered.

The plaintiffs present two due process arguments. Their broader contention is that due process always prohibits the defendants from using the mere fact of a previous suspension to justify the denial of an extension and always mandates an independent inquiry into whether a recipient actually has failed to comply with program requirements. Their narrower contention is that due process required such an independent inquiry in the circumstances of these cases. "In order to prevail on [either] due process [claim], the plaintiff[s] must prove that: (1) [they have] been deprived of . . . property [or liberty] interest[s] cognizable under the due process clause; and (2) the deprivation of the property [or liberty] interest[s] has occurred without due process of law. See *Double I Limited Partnership* v. *Planning & Zoning Commission*, 218 Conn. 65, 76, 588 A.2d 624 (1991); *Connecticut Education Assn., Inc.* v. *Tirozzi*, 210 Conn. 286, 293, 554 A.2d 1065 (1989) . . . ." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 231 Conn. 418, 437, 650 A.2d 557 (1994); *Tedesco* v. *Stamford*, 222 Conn. 233, 241–42, 610 A.2d 574 (1992). We thus address, seriatim, the nature of the property interests at stake and whether the plaintiffs were deprived of those interests without due process.

A

We first consider the extent of the plaintiffs' property interests in receiving general assistance extensions.

The defendants argue that, for two reasons, the plaintiffs had no such property interests at any time. The defendants first contend that no one has an "entitlement" to receiving an extension under § 17b-118, because that statute provides only that "[a] town *may* extend the period during which assistance is granted by *up to* three months for recipients who are in compliance with program requirements. . . ." (Emphasis added.) The defendants next contend that even if recipients who are eligible for extensions are entitled to receive those extensions, these plaintiffs had no property interests in the extensions because, having been suspended, they did not meet the eligibility requirements. The plaintiffs argue in response that everyone who is actually "in compliance with program requirements"—e.g., everyone who has not actually "wilfully failed to report for work"—has a property interest in receiving an extension.[15] We agree with the defendants that a recipient who properly has been suspended from general assistance has no cognizable property interest in receiving an extension of benefits. We further conclude, however, that *before* a recipient properly has been suspended from general assistance, he or she *does* have a property interest in receiving the extension. If the plaintiffs were suspended in the absence of the constitutionally required procedural safeguards, therefore, then they would continue to have protected property interests in receiving the extensions.

---

[15] The plaintiffs claim that they have property interests in receiving the extensions only as a result of the statute itself. They do not claim to have property interests as a result of independent constitutional requirements that the state provide general assistance benefits for twelve months per year. Cf. *Moore* v. *Ganim*, 233 Conn. 557, 660 A.2d 742 (1995); *Hilton* v. *New Haven*, 233 Conn. 701, 661 A.2d 973 (1995). We thus need not consider what process would be due in connection with the denials of extensions if the constitution independently required the state to provide such extensions.

"Property interests are more than abstract needs, desires or unilateral expectations of benefits or privileges. Rather, a person must have a legitimate claim of entitlement to a benefit or privilege to have a property interest in that benefit. *Board of Regents* v. *Roth*, [408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)]. Property interests are not created by the Constitution, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . . *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985), quoting *Board of Regents* v. *Roth*, supra, 577; see also *Paul* v. *Davis*, 424 U.S. 693, 709, 96 S. Ct. 1155, 47 L. Ed. 2d 405, reh. denied, 425 U.S. 985, 96 S. Ct. 2194, 48 L. Ed. 2d 811 (1976). *Connecticut Education Assn., Inc.* v. *Tirozzi*, supra, [210 Conn.] 294." (Internal quotation marks omitted.) *Double I Ltd. Partnership* v. *Planning & Zoning Commission*, supra, 218 Conn. 77–78.

The defendants first argue that the statute creates no property interests whatsoever in the receipt of general assistance extensions. We agree with the defendants that, under § 17b-118, Meriden had the discretion not to provide the extensions to anyone. We further agree with the defendants that, under the statute, Meriden continues to have discretion to provide extensions of varying durations on a case-by-case basis. Having elected pursuant to § 17b-118 to provide extensions to its residents, however, Meriden has *created* cognizable property interests in those extensions. Pursuant to the regulations implementing the statute, Meriden's election obligates it to provide extensions of benefits to all individuals who satisfy the eligibility requirements. See Regs., Conn. State Agencies § 17-3a-20 (K) (General Assistance Policy Manual [1993 Ed.] c. I, § X [K]) ("[e]ach town reserves the right to grant the three-month extension . . . [but if] a town chooses to

fund additional aid to its employable recipients, the town will uniformly apply the criteria set-forth in subsections 7. and 8. in each and every case"); see also *Kelley Property Development, Inc.* v. *Lebanon,* 226 Conn. 314, 322–23, 627 A.2d 909 (1993) (narrow circumscription of agency discretion to deny benefit demonstrates entitlement to benefit). Moreover, both statute and regulation constrain Meriden's ability arbitrarily to limit the duration of extensions among equally needy applicants. See General Statutes § 4-183 (j) (agency decisions may not be arbitrary or capricious); Regs., Conn. State Agencies § 17-3a-20 (K) (9) (General Assistance Policy Manual [1993 Ed.] c. I, § X [K] [9]) (duration of extension should be based on individual recipient's need). Finally, pursuant to § 17b-118 and the implementing regulations, the extensions are designed not as new benefits for which individuals must separately apply, but rather as a continuation of benefits already being provided during the first nine months of the year.[16] For these reasons, "the interest of an individual in continued receipt of these benefits is a statutorily created 'property' interest protected by the [Fourteenth] Amendment." *Mathews* v. *Eldridge,* 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); see also *Walters* v. *National Assn. of Radiation Survivors,* 473 U.S. 305, 320 n.8,

---

[16] Because the denial of an extension is properly characterized as a termination "of benefits already being received"; *Walters* v. *National Assn. of Radiation Survivors,* 473 U.S. 305, 320 n.8, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985); rather than a denial of an application for benefits in the first instance, we need not decide whether "applicants for [new] benefits . . . [also would have] a 'legitimate claim of entitlement' to benefits if they met the statutory qualifications." Id. We note that the United States Supreme Court repeatedly has declined to reach the same question. See *Lyng* v. *Payne,* 476 U.S. 926, 942, 106 S. Ct. 2333, 90 L. Ed. 2d 921 (1986); *Walters* v. *National Assn. of Radiation Survivors,* supra, 320 n.8; cf. *Shea* v. *State Employees' Retirement Commission,* 170 Conn. 610, 617, 368 A.2d 159 (1976) (individual had property interest in receipt of benefits once application had been approved, although benefits had not yet been provided).

105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985); *Goldberg* v. *Kelly*, 397 U.S. 254, 262 & n.8, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1969).

Although we determine that Meriden's election to provide benefits pursuant to the statute and regulations did endow some individuals with property interests in the receipt of those extensions, we nevertheless reject the plaintiffs' claim that all recipients are entitled to extensions as long as they have not actually violated the statutory "program requirements" in § 17b-118. We conclude, rather, that recipients are entitled to extensions only if they are eligible for such extensions pursuant to the governing regulations. Section 17b-118 provides in relevant part that "financial assistance granted . . . to an employable person *shall be limited* to no more than nine months in a twelve-month period. A town *may* extend the period during which assistance is granted by up to three months for recipients who are in compliance with program requirements. . . . The commissioner of social services shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section." (Emphasis added.) In other words, Meriden is authorized to provide extensions of benefits only pursuant to the implementing regulations. Thus, in electing to provide extensions, Meriden created property interests in those extensions only as to those eligible for such extensions pursuant to the regulations. Cf. *Lavine* v. *Milne*, 424 U.S. 577, 586, 96 S. Ct. 1010, 47 L. Ed. 2d 249 (1976) (no constitutional right to benefits prior to determination of eligibility).

Finally, although we conclude, as the defendants have argued, that only eligible individuals have property interests in receiving general assistance extensions, we reject the defendants' argument that these plaintiffs lacked such property interests. Before the plaintiffs' suspensions became final, the plaintiffs *were* eligible

for the extensions under the governing regulations. At the time of the suspensions, therefore, the plaintiffs *did* have property interests in receiving the extensions. These property interests could be extinguished only if the plaintiffs were afforded due process of law.

Once the plaintiffs' suspensions became final, the suspensions ordinarily would have rendered the plaintiffs statutorily ineligible for further extensions and thereby would have extinguished their constitutionally protected property interests in such extensions. Nevertheless, the suspensions could have extinguished the plaintiffs' property interests in the extensions only if the plaintiffs were afforded due process *before* the suspensions became final.

In other words, the issue underlying all the plaintiffs' due process claims is whether the plaintiffs were provided due process *before* the suspensions became final. We thus turn to that issue.

## B

The plaintiffs argue that they were denied due process in several respects, both before and after the suspensions became final. As noted above, however, we need to consider only those arguments that relate to the adequacy of the process provided before the plaintiffs' suspensions became final. There are two such contentions. First, the plaintiffs contend that it was unconstitutional for the regulations automatically to make them ineligible for the extensions at the time their suspensions became final, because, in doing so, the regulations created an unconstitutional "irrebuttable presumption." Second, the plaintiffs argue that they were not provided (a) an adequate opportunity to contest the suspensions, (b) an adequate notice of their opportunity to contest the suspensions, or (c) an adequate notice of the fact that, if they failed to challenge the suspensions, they would be ineligible for the exten-

sions. We reject the plaintiffs' first argument and conclude that, as to the second, the inadequacy of the present administrative record will require a remand for determination of the relevant facts.

We first conclude that it was not unconstitutional for the regulations automatically to make the plaintiffs ineligible for the extensions because of their previous suspensions. We assume, arguendo, that it is a violation of procedural due process for the government to deprive individuals of protected property interests by way of an "irrebuttable presumption." See *Michael H.* v. *Gerald D.*, 491 U.S. 110, 132, 109 S. Ct. 2333, 105 L. Ed. 2d 91 (1989) (Stevens, J., concurring); id., 157 (White, J., dissenting); id., 136 (Brennan, J., dissenting) ("[f]ive Justices agree that the flaw inhering in a conclusive presumption that terminates a constitutionally protected interest without any hearing whatsoever is a *procedural* one" [emphasis in original]); but see id., 120 (Scalia, J., for plurality) (previous cases that "struck down as illegitimate certain 'irrebuttable presumptions' . . . did not . . . rest upon *procedural* due process" [citations omitted; emphasis in original]). Nevertheless, the regulations here are valid because they do not create an unconstitutional "irrebuttable presumption."

At the outset, we are unpersuaded that the regulations create a "presumption" at all. According to the plaintiffs, the regulations embody a presumption that those who failed to challenge previous suspensions actually were not "in compliance with program requirements" at the time of the suspensions. The plaintiffs' argument, however, depends on the same unstated premises we discussed in part I of this opinion. Specifically, the plaintiffs assume that, in making "compliance with program requirements" a prerequisite to eligibility, § 17b-118 both makes "compliance with program requirements" the only criterion for eligibility and ordains the exclusive list of "program require-

ments" with which individuals must comply. If, however, the commissioner has the independent authority to impose eligibility criteria regardless of whether those criteria reflect "compliance with program requirements," or if the regulations themselves define the "program requirements" with which individuals must comply; see part I of this opinion; then the regulations do not embody a *presumption* at all. In either case, the regulations merely create a *substantive rule of law* that suspended individuals are not eligible for extensions. See *Parents Opposed to Punitive Support* v. *Gardner*, 998 F.2d 764, 767 (9th Cir. 1993) (no constitutional duty to consider evidence that child support award pursuant to "economic table" fails to "reflect the 'actual' cost of rearing [a] particular child" because "economic table is the implementation of a substantive rule of law"); *Anetekhai* v. *Immigration & Naturalization Service*, 876 F.2d 1218, 1223 (5th Cir. 1989) (law denying immediate relative status to aliens who marry citizens once deportation proceedings have commenced not unconstitutional; law does not embody a "[presumption] that the marriage is fraudulent" but merely sets out substantive rule that "the timing of [the] marriage places [the alien] in that class of aliens for whom a two-year nonresidency is required").

Moreover, even if the plaintiffs' premises were correct, and the regulations were construed to embody a "presumption" that suspended individuals are not "in compliance with program requirements," the presumption is not "irrebuttable." General assistance recipients *do* have an opportunity to prove that they are "in compliance with program requirements" by contesting the suspensions at the time those suspensions are imposed. A single opportunity to contest a presumption meets constitutional requirements. See *Michael H.* v. *Gerald D.*, supra, 491 U.S. 136 (Brennan, J., dissenting) (five justices agree about unconstitutionality of "conclusive

presumption that terminates a constitutionally protected interest *without any hearing whatsoever"* [emphasis added]); *Burton* v. *Planning Commission,* 13 Conn. App. 400, 405, 536 A.2d 995 (1988), aff'd, 209 Conn. 609, 553 A.2d 161 (1989) (where party had one opportunity to be heard, due process was not violated "by the application of a procedural rule [that] deems a party to have consented to a motion because of her failure to meet the requirement of the rule regarding timely filing" of opposition papers); cf. *Vlandis* v. *Kline,* 412 U.S. 441, 93 S. Ct. 2230, 37 L. Ed. 2d 63 (1973) (presumption of nonresidency unconstitutional because not rebuttable at any time).[17]

We turn now to the plaintiffs' alternate argument that they were denied due process in that they did not have (1) an adequate opportunity to contest the suspensions, (2) an adequate notice of their opportunity to contest the suspensions, or (3) an adequate notice of the fact that, if they failed to challenge the suspensions, they would be ineligible for the extensions. Because neither the state fair hearing officers nor the trial court considered these issues, we lack the factual

---

[17] We recognize that the presumption did become "irrebuttable" after the time for contesting the suspension had expired, when the suspensions had become final. Unless the plaintiffs were denied due process at the time of the suspensions, however, the plaintiffs no longer had property interests in the extensions after the suspensions had become final. See part II A of this opinion. Even if it is unconstitutional to deprive an individual of a protected liberty or property interest by way of an irrebuttable presumption; see text, supra; there is no constitutional infirmity in applying an irrebuttable presumption when no constitutionally protected liberty or property interest is at stake. See *Michael H.* v. *Gerald D.,* supra, 491 U.S. 120–22, 127; id., 132 (O'Connor, J., concurring); id., 133 (Stevens, J., concurring); id., 136 (Brennan, J., dissenting); id., 158, 160–61 (White, J., dissenting); see also *Weinberger* v. *Salfi,* 422 U.S. 749, 772–73, 777, 95 S. Ct. 2457, 45 L. Ed. 2d 522 (1975) (where no constitutionally protected interest is at stake, "irrebuttable" legislative classifications are unconstitutional only if patently irrational). Thus, the irrebuttability of the presumption after the suspensions had become final is relevant only if the plaintiffs were denied due process before the suspensions.

record required to resolve the plaintiffs' claims. The record does not specify whether these plaintiffs were provided an opportunity to challenge their suspensions. Cf. General Statutes §§ 17b-64, 17b-63; Regs., Conn. State Agencies § 17-3a-23 (E) (7) (General Assistance Policy Manual [1993 Ed.] c. I, § XIII [E] [7]). The record also does not specify whether the plaintiffs were notified of their right to appeal the suspensions or the fact that an unchallenged suspension would lead to ineligibility for the extension.[18] We must, therefore, remand these cases to the commissioner to find the facts and resolve the claims in the first instance.

Once the commissioner finds the relevant facts, her review of the plaintiffs' claims must be governed by the *Mathews* v. *Eldridge* due process test. " 'The United States Supreme Court [has] set forth three factors to consider when analyzing whether an individual is constitutionally entitled to a particular judicial or administrative procedure: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge*, [supra, 424 U.S. 335].' " *Matza* v. *Matza*, 226 Conn. 166, 174, 627 A.2d

---

[18] Although the record contains some notices that allegedly were provided to the plaintiffs, we decline to make factual findings in the first instance as to whether, and when, these notices were provided. We also express no opinion as to whether the plaintiffs properly have preserved a claim, mentioned to us at oral argument, that even if the notices were provided, the notices were constitutionally insufficient because they were only in English. If the claim was preserved and if resolution of the claim is necessary to decide whether the plaintiffs received due process before their suspensions became final, we instruct the commissioner on remand to consider the claim under the *Mathews* v. *Eldridge* test described in the text, infra.

414 (1993); *Scinto* v. *Stamm*, 224 Conn. 524, 535, 620 A.2d 99, cert. denied, 510 U.S. 861, 114 S. Ct. 176, 126 L. Ed. 2d 136 (1993).

Previous opinions of this court and of the United States Supreme Court provide substantial guidance as to how the *Mathews* v. *Eldridge* test should be applied to the plaintiffs' claim. We previously have noted that, because welfare benefits are available only to those who have no other means of support, the private interest in the receipt of such benefits is very significant. See *Shea* v. *State Employees' Retirement Commission*, 170 Conn. 610, 617, 368 A.2d 159 (1976). The United States Supreme Court has further held that, without substantial procedural guarantees, there are significant risks that welfare recipients will be erroneously deprived of their property interests in those benefits. See *Goldberg* v. *Kelly*, supra, 397 U.S. 266.[19] Moreover, even outside the context of welfare benefits, we have held that the due process clause requires, at a minimum, that the "state actor afford individuals notice of and an opportunity for a hearing before depriving them of their property interests. *Cleveland Board of Education* v. *Loudermill*, supra, [470 U.S.] 542; *Boddie* v. *Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 28 L. Ed. 2d 113

[19] Applying the precursor version of the *Mathews* v. *Eldridge* test, "the United States Supreme Court identified several elements of due process that must be part of the procedure employed by the state prior to its decision to terminate a welfare recipient's benefits. The court concluded that the recipient is entitled to the following procedure: (1) timely and adequate notice detailing the reasons for a proposed termination; *Goldberg* v. *Kelly*, [supra, 397 U.S. 267–68]; (2) a hearing before an impartial decisionmaker; id., 271; (3) the opportunity to confront and cross-examine adverse witnesses and to present evidence and argument; id., 268–70; (4) the right to be represented by counsel; ibid.; (5) a determination by the decisionmaker that rests solely on the legal rules and evidence adduced at the hearing, which, in turn, requires the decisionmaker to state the reasons for his determination and indicate the evidence he relied on. Id., 271." (Internal quotation marks omitted.) *Lee* v. *Board of Education*, 181 Conn. 69, 77–78, 434 A.2d 333 (1980), on appeal after remand sub nom. *Halpern* v. *Board of Education*, 231 Conn. 308, 649 A.2d 534 (1994).

(1971); *Bartlett* v. *Krause*, [209 Conn. 352, 372, 551 A.2d 710 (1988)]." *Connecticut Education Assn., Inc.* v. *Tirozzi*, supra, 210 Conn. 299. "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. . . . It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." (Citations omitted; internal quotation marks omitted.) *Roundhouse Construction Corp.* v. *Telesco Masons Supplies Co.*, 168 Conn. 371, 376–77, 362 A.2d 778, vacated, 423 U.S. 809, 96 S. Ct. 20, 46 L. Ed. 2d 29 (1975), on remand, 170 Conn. 155, 365 A.2d 393, cert. denied, 429 U.S. 889, 97 S. Ct. 246, 50 L. Ed. 2d 172 (1976).

In sum, we conclude that the defendants were authorized to deny the extensions of benefits based solely on the previous suspensions, unless, at the time of those suspensions, the plaintiffs had been deprived of their property interests in the extensions without due process of law. The trial court implied, to the contrary, that the defendants never would be authorized to deny the extensions based solely on the previous suspensions, and it remanded the cases to the commissioner "for a new decision by the hearing officer, based on all the evidence in the record, including evidence concerning the validity of the suspension[s] . . . ." Because the current record does not demonstrate that the plaintiffs were denied due process at the time of the suspensions, we are persuaded that the trial court's remand order was misdirected. Therefore, although we also remand the cases to the commissioner, we do so with different instructions.

On remand, the commissioner initially must determine whether at the time of the suspensions—that is,

at the time the plaintiffs' property interests in the extensions purportedly were extinguished—the plaintiffs received the process that was then due. If the plaintiffs were not provided adequate process at the time of their suspensions, then the commissioner may not uphold the denials of the extensions on the basis of the suspensions alone and must grant the extensions, unless there is some other valid, properly preserved reason to deny the extensions. See, e.g., footnote 6.

Each judgment is affirmed insofar as it ordered a remand to the commissioner, but each case is remanded with direction to amend the terms of that order of remand to comport with the requirements stated immediately above.

In this opinion CALLAHAN, BORDEN, NORCOTT, KATZ and PALMER, Js., concurred.

BERDON, J., dissenting. The issue before this court is whether the commissioner of social services[1] (commissioner), in affirming the city of Meriden's refusal to extend the plaintiffs' general assistance benefits, correctly refused to consider evidence offered by the plaintiffs as to the reasons they had failed to comply with workfare requirements. The majority holds that this depends upon whether the plaintiffs were afforded due process when they initially were suspended for their alleged workfare violations.[2] In my view, however,

---

[1] The department of income maintenance was replaced by the department of social services on July 1, 1993. See Public Acts 1993, No. 93-262.

[2] I agree with the majority, of course, that the government must afford a recipient of general assistance benefits procedural due process before it may terminate these benefits because of the recipient's failure to comply with program requirements. See part II B of the majority opinion. In such cases, due process requires that the recipient be provided with notice of the government's intent to act; *Mullane* v. *Central Hanover Bank & Trust*

state law entitles such plaintiffs, when contesting a town's denial of the extension of general assistance benefits pursuant to General Statutes § 17b-118,[3] to have the commissioner determine whether they were in compliance with the workfare rules. Furthermore, state law entitles such plaintiffs to have the commissioner make this determination without regard to a town's previous determination on the matter.

Each plaintiff in this case was provided with a hearing before the commissioner,[4] pursuant to General Statutes § 17b-64,[5] during which he or she contested Meriden's refusal to extend general assistance benefits. At each hearing, the commissioner heard evidence that the recipient had not wilfully failed to report to work earlier in the year. Clarence Harkless, for example, testified that he had been unable to work because of medical problems related to a blood clot in his leg, and he submitted supporting medical documentation at the hearing. Michelle Lawson testified that she had tried to move out of state, but had returned to Connecticut after a friend died. Rufino Pabon, who is illiterate in English, testified that the person he thought was

Co., 339 U.S. 306, 314–15, 70 S. Ct. 652, 94 L. Ed. 865 (1950); *Baldwin* v. *Hale*, 68 U.S. 223, 233, 17 L. Ed. 531 (1863); and with a meaningful opportunity to be heard. *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965). These constitutional tenets are fundamental and beyond debate. I disagree, however, that the court needs to rely on these principles in this case.

[3] See footnote 1 of the majority opinion.

[4] The applicable statutes provide that these hearings may be conducted by the commissioner or by "any person authorized by him"; General Statutes § 17b-64 (b); and that the decision shall be rendered by the commissioner "or his designated hearing officer." General Statutes § 17b-65 (a); see footnote 3 of the majority opinion. For purposes of clarity and convenience, however, I refer to the person conducting the hearing and rendering the decision as the commissioner.

[5] See footnote 3 of the majority opinion.

his supervisor indicated he had completed his workfare hours for the month, and that he believed he had completed the necessary hours.

The commissioner, however, refused to consider this evidence in making her determination of eligibility for the extended § 17b-118 benefits. She concluded that "[r]egardless of the correctness of this suspension, the appellant was suspended for the three month period and this action was not contested or overturned. . . . It is simply too late to argue about the suspension that the appellant accepted and served, regardless of what led to the suspension."

This conclusion, in my view, was incorrect. The commissioner, in deciding whether the plaintiffs were eligible for the extended general assistance benefits, was required to determine if they were "in compliance with program requirements." General Statutes § 17b-118. In making this determination, the commissioner was required, under a special statutory scheme applicable to welfare benefits, to conduct a de novo hearing; see General Statutes § 17b-64; and to "render a final decision based upon all the evidence introduced before him." General Statutes § 17b-65 (formerly § 17-292f). It is clear that at such a hearing the "strict rules of evidence" do not apply, and that the hearing "must be conducted so as not to violate the fundamental rules of natural justice." (Internal quotation marks omitted.) *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 536, 525 A.2d 940 (1987).

The legislature, by enacting a special process by which a poor person could appeal directly to the commissioner a town's determination that he or she was ineligible for subsistence benefits, demonstrated its deep concern about the rights that were at stake. The legislature recognized that subsistence for the poor—

shelter, food and medical care—is fundamental to life, and that the "stakes are simply too high" for a poor person to be denied a full and meaningful hearing before benefits are terminated or denied. (Internal quotation marks omitted.) *Goldberg* v. *Kelly*, 397 U.S. 254, 266, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). The purpose of the special review process was obviously remedial, and the procedures were designed to protect the rights of the poor to assure that they were not wrongfully deprived of welfare benefits.[6] The review provisions, therefore, must be liberally construed in favor of this class of poor persons. See *Persico* v. *Maher*, 191 Conn. 384, 395, 465 A.2d 308 (1983) (courts must apply "the rule of liberal construction in furtherance of the beneficent purposes for which the remedial legislation . . . was enacted").

Accordingly, in cases such as these, where the commissioner has not previously determined whether the recipient of general assistance benefits wilfully failed to comply with program requirements, the commissioner must conduct a de novo review and make this determination. Therefore, I agree with the trial court that these cases should be remanded to the commissioner for a new decision, based upon all the evidence in the record, including evidence concerning the validity of the suspension of the plaintiffs' general assistance benefits by Meriden's welfare officials.

---

[6] Indeed, the entire statutory review scheme reflects the legislature's concern with protecting the rights of the benefit recipient. General Statutes § 17b-65 (a), for example, requires the commissioner to render a fair hearing decision "[n]ot later than fifteen days after such hearing, or three business days if the hearing concerns a decision on an application for assistance." These provisions recognize that a town's decision to deny or terminate general assistance benefits can have grave consequences, and that prompt review of local decisions by the commissioner is essential.