[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Memorandum of Decision
 I. Statement of Case
This is an administrative appeal from a final decision of the State of Connecticut Department of Social Services (DSS), brought pursuant to General Statutes § 17b-61 and § 4-183. The plaintiff is Nancy Costa. The defendant is the Commissioner of DSS.
 II. Procedural History
CT Page 10573
Nancy Costa resides in a nursing home. (Return of Record [ROR], Transcript, p. 144.)[1] Nancy Costa applied to DSS for Title XIX medical assistance for long term care on June 26, 1998. (ROR, Hearing Summary, p. 21.) DSS denied the application on November 24, 1998 based upon a finding that Nancy Costa had excess assets. (ROR, Hearing Summary, p. 21.) On January 4, 1999, Nancy Costa requested an administrative hearing to contest the denial of her application and to request an increase in the community spouse protected amount (CSPA). (ROR, p. 75.) On March 2, 1999, a DSS fair hearing officer (FHO) conducted an evidentiary hearing. (ROR, Transcript, pp. 139-59.) The FHO issued a written decision dated May 19, 1999, that included findings of fact and conclusions of law. (ROR, May 19, 1999 Hearing Decision, pp. 1-5.) The FHO disagreed with the denial of Title XIX benefits and directed the regional office to increase the CSPA, provided all other eligibility factors were met. (ROR, May 19, 1999 Hearing Decision, pp. 1-5.) On May 25, 1999, the FHO learned that the community spouse,[2] Adolfo Costa, had died even before the administrative hearing was requested by the institutionalized spouse.[3] (ROR, June 2, 1999 Notice of Reconsideration, p. 117.) The ERG reopened the record and requested additional information from the parties. (ROR, June 2, 1999 Notice of Reconsideration, p. 117.) On March 21, 2000, the FHO rendered a reconsidered decision denying Title XIX benefits.[4] (ROR, March 21, 2000 Reconsidered Decision, pp. 6-11.) Briefly stated, the FHO reasoned that the financial needs of the community spouse concluded at the time of his death. Accordingly, he did not need an increase in his CSPA to avoid impoverishment.
The plaintiff commenced the present administrative appeal through her petition for appeal filed in the Superior Court, judicial district of New Britain.
 III. Jurisdiction
A. Aggrievement
General Statutes § 17b-61 (b) provides in pertinent part: "[T]he applicant . . . if aggrieved, may appeal therefrom in accordance with § 4-183." General Statutes § 4-183 (a) provides in relevant part that "[a] person . . . who is aggrieved by a final decision may appeal to the Superior Court. . . ."
 [T]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal CT Page 10574 interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision.
Med-Trans of Conn., Inc. v. Dept. of Public Health and Addiction Services,242 Conn. 152, 158-59, 699 A.2d 142 (1997).
In the present matter the plaintiff was denied Title XIX benefits. This court finds that the plaintiff is aggrieved.
B. Timeliness of Appeal
General Statutes § 4-183 (c) provides:
 Within forty-five days after mailing of the final decision under section 4-180 or, if there is no mailing, within forty-five days after personal delivery of the final decision under said section, a person appealing as provided in this section shall serve a copy of the appeal on the agency that rendered the final decision at its office or at the office of the Attorney General in Hartford and file the appeal with the clerk of the superior court for the judicial district of New Britain or for the judicial district wherein the person appealing resides or, if that person is not a resident of this state, with the clerk of the court for the judicial district of New Britain. Within that time, the person appealing shall also serve a copy of the appeal on each party listed in the final decision at the address shown in the decision, provided failure to make such service within forty-five days on parties other than the agency that rendered the final decision shall not deprive the court of jurisdiction over the appeal. Service of the appeal shall be made by (1) United States mail, certified or registered, postage prepaid, return receipt requested, without the use of a state marshal or other officer, or (2) personal service by a proper officer or indifferent person making service in the same manner as complaints are served in ordinary civil actions. If service of the appeal is made by mail, service shall be effective upon deposit of the appeal CT Page 10575 in the mail.
Through notice dated April 19, 2000, DSS transmitted the FHO's corrected notice of the reconsidered decision. The plaintiff filed this appeal in the Superior Court, judicial district of New Britain on May 5, 2000. Thus, this court finds the appeal is timely.
IV. Standard of Review
The judicial review of an administrative agency is very restricted and governed by the Uniform Administrative Procedure Act (UAPA). CadlerockProperties Joint Venture, L.P. v. Commissioner of Env. Protection,253 Conn. 661, 668, 757 A.2d 1 (2000), cert. denied, ___ U.S. ___,121 S.Ct. 1089, 148 L.Ed.2d 963 (2001).
 The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
General Statutes § 4-183 (1).
 Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .
 The substantial evidence rule governs judicial review CT Page 10576 of administrative factfinding under the UAPA. General Statutes § 4-183 (j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [S]ubstantial evidence . . . is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . (Citations omitted.)
Cadlerock Properties Joint Venture, L.P. v. Commissioner of Env.Protection, supra, 253 Conn. 676-77, quoting Dolger v. Alander,237 Conn. 272, 280-82, 676 A.2d 865 (1996).
The court must search the entire record to determine whether substantial evidence exists to support the agency's findings of fact, and whether the conclusions drawn from those facts are reasonable. Dolgnerv. Alander, supra, 237 Conn. 283.
 Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application to the law of the facts found and could reasonably and logically follow from such facts. (Citations omitted.)
Cadlerock Properties Joint Venture, L.P. v. Commissioner of Env.Protection, supra, 253 Conn. 669, quoting Board of Labor Relations v.Freedom of Information Commission, 244 Conn. 487, 93-94, 709 A.2d 1129
CT Page 10577 (1998).
 V. Discussion Plaintiff's Claims of Error
The plaintiff has briefed five alleged claims of error: (1) DSS improperly applied the Medicare Catastrophic Coverage Act (MCCA) rule of42 U.S.C. § 1396r-5; (2) the plaintiff was denied due process of law; (3) DSS's conduct denied her equal protection under the law; (4) DSS denied the plaintiff's Medicaid application based on policy which had not been promulgated in accordance with the UAPA; and (5) DSS committed marital status discrimination in violation of General Statutes §46a-64, Connecticut Public Accommodations Act. (Plaintiff's Brief).
The FHO framed the issues to be addressed in the May 19, 1999 decision in the following manner:
 (1) Can the community spouse protected allowance (CSPA) be increased?
 (2) Did the applicant's counted assets exceed the Medicaid asset limit on July 1, 1998?
 (3) Does the applicant's husband need a community spouse allowance (CSA)?
(ROR, May 19, 1999 Hearing Decision, p. 1.)
In the May 19, 1999 decision the FHO stated the following in relevant part:
 DISCUSSION A hearing officer is authorized to increase a CSPA when it is shown that the community spouse needs the income produced by the institutionalized spouse's share of the couple's assets in order to meet his or her MMNA. The MMNA is calculated by a formula based on the federal poverty level.
 In this case the community spouse's claimed monthly expenses are included in the calculation of the MMNA. No exceptional circumstance was claimed.
 Because the income of the community spouse is CT Page 10578 insufficient to meet his MMNA it is determined that he needs to keep the assets he has sought to keep so that he can use the income from those assets to meet his needs in the community. His CSPA is therefore increased.
 Because the community spouse's Social Security and interest income is insufficient to meet his MMNA it is determined that he needs $95.23 of his wife's monthly income to meet his needs.
 DECISION The regional office is directed to change the Community Spouse Protected Amount to $147,527.98 and grant Medicaid to the applicant provided all other eligibility factors have been met.
(ROR, May 19, 1999 Hearing Decision, p. 4.)
The FHO made nineteen findings of fact:
 1. The applicant applied for Medicaid on June 26, 1998.
 2. On November 24, 1998 that application was denied because the applicant's counted assets exceeded the Medicaid asset limit of $1,600.00.
 3. The applicant began a continuous period of institutionalization on May 26, 1998.
 4. An assessment of spousal assets was completed on November 24, 1998. It was revised twice after that. The combined total of this couple's assets was $147,527.98 as of the date of institutionalization.
 5. The Department determined that the community spouse's share of nonexempt assets was $81,896.00.
 6. The Department determined that the applicant's share of the couple's nonexempt assets was $65,567.98. CT Page 10579
 7. The Department determined that $81,960.00 was the CSPA.
 8. The community spouse's monthly shelter costs are $45.17 for property tax and $62.00 for homeowner's insurance.
 9. For the purpose of calculating his MMNA the community spouse has monthly shelter costs of $356.17.
 10. For the purpose of calculating his MMNA the community spouse has no monthly excess shelter costs.
11. The community spouse's MMNA is $1,356.25.
 12. In July 1998, the community spouse had monthly gross income of $644.80 from Social Security.
 13. The community spouse's monthly income is not sufficient to meet his MMNA.
 14. As of the date of institutionalization the spousal assets of $147,528 earned interest at an estimated average rate of 4% annually or $491.76 monthly.
 15. The community spouse needed the interest income from the couple's total assets as of the date of institutionalization in order to partially meet his MMNA.
16. The CSPA is $147,528.
 17. As of the date of institutionalization the applicant's assets did not exceed $1600.00.
 18. As of July 1998, the beginning date for which benefits are requested, the couple's remaining counted assets totaled $126,931.06. Monthly interest of $616.22 was generated from the investment of these assets.
 19. Beginning July, 1999, the community spouse needed a CSA of $95.23 from his wife's monthly income in order to meet his MMNA. CT Page 10580
(Citations to administrative record omitted). (ROR, Hearing Decision, pp. 2-3.)
On May 25, 1999, six days after the decision was rendered, the FHO learned that Adolfo Costa, the community spouse, had died on or about December 27, 1998. (ROR, March 21, 2000 Hearing Decision, p. 7.) As a result, the FHO reopened the record pursuant to General Statutes §4-181a (a)[5] and sent the parties a letter dated June 2, 1999, requesting that both parties respond to the following questions: "(1) Does Mrs. Costa have standing to request a hearing to contest the Department's spousal assessment? and (2) For what purpose does Mrs. Costa seek to increase the Community Spouse Protected Allowance above the amount set by the Department on November 24, 1998?" (ROR, June 2, 1999 Notice of Reconsideration, p. 117.) Both parties responded but neither party submitted additional evidence or requested further proceedings.
The FHO reopened the record pursuant to General Statutes § 4-181a, conducted a desk review of the issues and closed the record on September 1, 1999. (ROR, March 21, 2000 Reconsidered Decision, pp. 6-11.) On March 21, 2000, the FHO rendered a reconsidered decision which was subsequently amended on April 19, 2000. The decision provided in relevant part:
 DISCUSSION It was not shown in this hearing that during the lifetime of the applicant's spouse, in order to avoid impoverishment, he needed to retain more than the amount of his spousal share of the couple's total assets, as determined by the Department on November 24, 1998. The community spouse's needs ceased at his death. He therefore did not need to have his CSPA increased for the purpose of meeting his MMNA. That is the only purpose for which a hearing officer can increase a CSPA which has been correctly determined by the regional office staff. The applicant's CSPA cannot be increased.
 The applicant's spouse did have an MMNA from the date of his wife's application for Medicaid until the date of his death. During this period his spousal share of the couple's assets, $81,690.00, combined with his income, was sufficient to meet his MMNA. Since it was not necessary to increase this CSPA in order to prevent impoverishment of this community spouse I have found that this CSPA may not be increased. CT Page 10581
 DECISION The regional office is upheld in its determination that the applicant's share of this couple's total assets was $65,567.98, as of the date of institutionalization. Since her counted assets exceeded the asset limit the Department correctly denied her Medicaid application on November 24, 1998.
(ROR, April 19, 2000 Corrected Reconsidered Decision, p. 16.)
In support of these conclusions the FHO made certain findings of fact. The first seven were identical to those already stated in her May 19, 1999 decision and the following represent the remainder of her findings:
 8. The community spouse died on December 27, 1998.
 9. From May, 1998 through December, 1998 the community spouse's monthly shelter costs were $45.17 for property tax and $62.00 for homeowner's insurance.
 10. For the purpose of calculating his Minimum Monthly Needs Allowance (MMNA) the community spouse had monthly shelter costs of $356.17.
 11. For the purpose of calculating his MMNA the community spouse had no monthly excess shelter costs.
12. The community spouse's MMNA was $1356.25.
 13. In July, 1998 the community spouse had monthly gross income of $644.80 from Social Security.
 14. As of the date of institutionalization the spousal assets of $147,528.00 earned interest at an estimated average rate of 4% annually or $491.76 monthly.
 15. As of July, 1998, the beginning date for which benefits are requested, the couple's remaining assets totaled $126,931.06. Monthly interest of $616.22 was generated from the investment of these CT Page 10582 assets.
 16. From May, 1998, the date of his wife's institutionalization, through December 27, 1998, the date of his death, the community spouse had available to him his share of the couple's assets (his CSPA) as well as interest from that share and his Social Security income.
 17. For the period from May, 1998, through December, 1998 the appellant's MMNA totaled $10,850.00 ($1356.25 X 8 months)
 18. From May, 1998 through December, 1998 the appellant did not need interest from his wife's spousal share of their assets in order to meet his MMNA.
19. The CSPA is $81,960.00.
 20. As of November 24, 1998, the date of denial, the applicant's counted assets did not exceed $1600.00.
(Citations to administrative record omitted.) (ROR, April 19, 2000 Corrected Reconsidered Decision, pp. 13-14.).
 Analysis of Plaintiff's Claims of Error
1. DSS Improperly Applied the MCCA Rule of 42 U.S.C. § 1396r-5, and
2. The Plaintiff was Denied Due Process of Law[6]
The plaintiff makes several arguments pertaining to these claims of administrative error. She asserts "[t]he circumstances presented clearly justified an increased Community Spouse Resource Allowance and retention of all assets available on the date of institutionalization." (Plaintiff's Brief, p. 7.) The plaintiff further contends "the purpose of the `Spousal Impoverishment' rules is to prevent the impoverishment of the community spouse, the ruling of the DSS in this case is counter to the spirit and intent of the federal scheme." (Plaintiff's Brief, p. 7.)
The plaintiff also argues that she was deprived of her due process protections by the FHO's reversal of the March 2, 1999 decision granting her Medicaid benefits because she had a protected property interest in CT Page 10583 those benefits. In this regard she contends that she was entitled to: (1) notice and a hearing prior to the Department's revocation of her benefits; (2) timely and adequate notice of a proposed benefit termination pursuant to UPM § 1500.01;[7] and (3) an opportunity to present or address evidence or arguments. (Plaintiff's Brief, p. 16.) In addition, the plaintiff contends that her first opportunity to be heard was untimely as it occurred eight months after she applied for benefits and that she did not receive adequate notice pursuant to UPM § 1500.01. (Plaintiff's Brief, p. 20.)
DSS contends that, "[t]he crux of the community spouse provisions are to prevent impoverishment of the community spouse. Consideration of the community spouse's "needs' only makes sense if the spouse is alive. At a most fundamental level, therefore, the statutes and regulations presume that there is a living community spouse." (Defendant's Brief, 13.) DSS asserts that the hearing process was impeded because the plaintiff neglected to provide the department with accurate facts, i.e., that her spouse had died two months prior to the hearing. (Defendant's Brief, p. 11.) DSS further argues that the plaintiff had no property interest in receiving benefits because her application had not been approved. (Defendant's Brief, p. 13.) DSS further contends that the FHO's conclusions were supported by substantial and competent evidence in the record and were well within the FHO's discretion. (Defendant's Brief, p. 16, et seq.) Finally, with regard to the adequacy of notice, DSS argues that the FHO's June 2, 1999 notice of reconsideration stated that pursuant to General Statutes § 4-181a (a) the record was being reopened and that the FHO's intent was quite clear based on the questions she posed to the parties. (Defendant's Brief, p. 15.)
Our Supreme Court recently reviewed the history of the Medicaid program:
 The medicaid program, established in 1965 as Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396 et seq., provid[es] federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. 42 U.S.C. § 1396 et seq. Although states participate voluntarily, a state electing to participate must develop a plan, approved by the secretary of health and human services, containing reasonable standards, for determining eligibility for and the extent of medical assistance. . . . 42 U.S.C. § 1396a (a) (17). Connecticut has elected to participate in the medicaid program and has assigned to the department the task of administering the program. General Statutes § 17-134 (a) et CT Page 10584 seq. (Citations omitted.)
Ross v. Giardi, 237 Conn. 550, 555-56, 680 A.2d 113 (1996), quotingMatarazzo v. Rowe, 225 Conn. 314, 319, 623 A.2d 470 (1993). See alsoAhern v. Thomas, 248 Conn. 708, 733 A.2d 756 (1999).
DSS administers the Connecticut Medicaid system. General Statutes § 17b-260. General Statutes § 17b-261 (a) addresses medical eligibility: "Medical assistance shall be provided for any otherwise eligible person . . . and if such person is an institutionalized individual . . . and has not made an assignment or transfer or other disposition of property for less than fair market value for the purpose of establishing eligibility for benefits or assistance under this section." Pursuant to General Statutes § 17b-10 (c), DSS, in carrying out its regulatory authority, has promulgated a Uniform Policy Manual (UPM).
 In 1988, Congress enacted the Medicare Catastrophic Coverage Act of 1988 (MCCA). Pub.L. No. 100-360, 102 Stat. 683 (1988), codified at 42 U.S.C. § 1396r-5. "The objective of the MCCA was to protect married couples when one spouse is institutionalized in a nursing home, so that the spouse who continues to reside in the community is not impoverished and has sufficient income and resources to live independently.' See H.R. Rep. No. 100-105 (II), 100th Cong., 2d Sess. at 65 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 888. Prior to 1988, the medicaid eligibility rules required couples to deplete their combined resources before the institutionalized spouse was eligible for benefits, often leaving the community spouse financially vulnerable. The MCCA attempted to strike a balance between preventing impoverishment of the community spouse by excluding minimum amounts of resources and income for that spouse from eligibility considerations, and preventing a financially solvent institutionalized spouse from receiving Medicaid benefits by ensuring that income was not completely transferred to the community spouse.
O'Callaghan v. Commissioner of Social Services, 53 Conn. App. 191,195-96, 729 A.2d 800 (1999), quoting Chambers v. Ohio Dept. of HumanServices, 145 F.3d 793, 798, (6th Cir.) cert. denied, 525 U.S. 464,119 S.Ct. 408, 142 L.Ed.2d 331 (1998).
The United States Supreme Court has made it clear that "Congress chose CT Page 10585 to direct those limited funds to persons who were most impoverished. . . ."Schweiker v. Hogan, 457 U.S. 569, 590, 102 S.Ct. 2597, 73 L.Ed.2d 227
(1982). The Connecticut Supreme Court has stated: "The policy underlying today's decision reflects the legislative concern that the medicaid program would be at fiscal risk if applicants were permitted to divert income in ways not sanctioned by law." Clark v. Commissioner,209 Conn. 390, 405, 551 A.2d 729 (1988).
Title 42 U.S.C. § 1396r-5 (f)(2) defines the amount of resources allocated to a community spouse as the community spouse resource allowance. "The resource allowance is protected from the institutionalized applicant's health care obligations and does not count against the applicant's financial eligibility. In addition, under the catastrophic care act, a community spouse is entitled to a "minimum monthly maintenance needs allowance'. . . . 42 U.S.C. § 1396r-5 (d) (3); Uniform Policy Manual (1992) § 5035.30(B)(2)." Burinskas v.Dept. of Social Services, 240 Conn. 141, 149, 691 A.2d 586 (1997). If either spouse is dissatisfied with the defendant's determination of the resource allowance, that spouse is entitled to a fair hearing.42 U.S.C. § 1396r-5 (e)(2)(A)(v). Title 42 U.S.C. § 1396r-5
(e)(2)(C) sets out the statutory provisions for revising the CSPA.
The plaintiff's eligibility to receive Medicaid benefits was determined as of the date of her institutionalization, as was the total value of the couple's resources in order to allocate a portion of the resources to each spouse.[8] (ROR, Hearing Summary, p. 21.) 42 U.S.C. § 1396r-5
(c)(1); UPM 1507.05. DSS denied the plaintiff's application for long term nursing home medical assistance because, on the date of her institutionalization, her assets, $65,567.98, exceeded the agency's asset limit of $1600. (ROR, Hearing Summary, p. 21; ROR, Assessment of Spousal Assets, p. 32.)
The purpose of the March 2, 1999, fair hearing, convened by the FHO, was to permit the plaintiff to have the opportunity to attempt to establish a need to increase the CSPA in order to generate enough income to meet Adolfo Costa's MMNA. (ROR, Transcript, p. 148.) The plaintiff's attorney presented evidence at the hearing in support of the position that the CSPA should be increased because Adolfo Costa had insufficient income to meet his MMNA. (ROR, Transcript, pp. 150 et seq.) At the time of the March 2, 1999 hearing, the FHO was unaware that Adolfo Costa was dead. In fact, the record reflects that he died on December 27, 1998, approximately two months earlier. (ROR, June 2, 1999 Notice of Reconsideration, p. 117) Neither the plaintiff's attorney nor her daughter, who had been granted her mother's power of attorney, informed the FHO that the community spouse had since died. In fact, references were made throughout the hearing from which it was reasonable to conclude CT Page 10586 that Adolfo Costa was still alive, e.g., the initial application for benefits was presented as a full exhibit (ROR, Transcript, p. 152), and the plaintiff's attorney informed the FHO that he was the attorney for both Adolfo and Nancy Costa (ROR, Transcript, p. 143.) It was not until January 4, 1999, or approximately nine days after the community spouse's untimely death that the surviving spouse even requested a fair hearing to contest the denial of Nancy Costa's Title XIX application for Medicaid assistance and to increase the CSPA. (ROR, January 4, 1999 request for fair hearing, p. 75.)
Approximately six days after issuing her May 19, 1999 decision, the FHO discovered that Adolfo Costa had in fact died almost five months earlier on December 27, 1998.[9] (ROR, June 2, 1999 Notice of Reconsideration, p. 117.) Having learned this new information, the FHO reopened the record and requested additional information from the parties. (ROR, June 2, 1999 Notice of Reconsideration, p. 117.)
The plaintiff claims she was deprived of her due process protections by the FHO's reversal of the May 19, 1999 decision because she had a protected property interest in receiving Title XIX benefits. The constitution of Connecticut, article first, § 10 and the due process clause of the United States Constitution prohibits state actors from depriving individuals of property or liberty without due process. InHarkless v. Rowe, 232 Conn. 599, 616, 657 A.2d 562 (1995), the Connecticut Supreme Court outlined the elements a plaintiff must meet in order to prevail on a due process claim: "(1) [they have] been deprived of . . . property [or liberty] interest[s] cognizable under the due process clause; and (2) the deprivation of the property [or liberty] interest[s] has occurred without due process of law."
The plaintiff relies on Shea v. State Employees' RetirementCommission, 170 Conn. 610, 368 A.2d 159 (1976), for the proposition that property rights exist in benefits that have been approved but not yet received. The plaintiff's reliance under the facts in this case is in error because in this instance she had no vested interest in Medicaid benefits. Nancy Costa was to be awarded Title XIX benefits "provided all other eligibility factors ha[d] been met." (ROR, May 19, 1999 Hearing Decision, p. 4.) The FHO's initial decision to award benefits was contingent on all other eligibility factors being met. It is reasonable for a FHO to consider a community spouse being alive as an eligibility factor when determining whether a CSPA should be increased in order to avoid the community spouse's impoverishment. Hence, where the FHO later discovered this eligibility requirement was not fulfilled the benefits were not awarded. As the plaintiff's application for Medicaid benefits had never been approved, there could be no termination that violated her due process rights. Therefore, the FHO's decision to deny the plaintiff's CT Page 10587 application did not violate her due process.
The court has determined that the plaintiff failed to obtain a property interest in the Title XIX benefits. In addition, the court has determined that the due process accorded was sufficient in this instance. "Inquiry into whether particular procedures are constitutionally mandated in a given instance requires adherence to the principle that due process is flexible and calls for such procedural protections as the particular situation demands. There is no per se rule that an evidentiary hearing is required whenever a liberty interest may be affected. Due process . . . is not a technical conception with a fixed content unrelated to time, place and circumstances. . . ." (Citations omitted.) State v. Kelly, 256 Conn. 23, 78, 770 A.2d 908 (2001). See alsoAngelsea Productions, Inc. v. Commission on Human Rights Opportunities, 236 Conn. 681, 698, 674 A.2d 1300 (1996). Therefore, the court deems it unnecessary to discuss the issue further other than to note that both parties had adequate notice that Adolfo Costa's death was at issue by virtue of the FHO's correspondence dated June 2, 1999 and that each party was given ample opportunity to respond and address the FHO and neither choose to present additional evidence, argument or request an administrative hearing. (ROR, June 2, 1999 Notice of Reconsideration, p. 117; ROR, DSS responses, pp. 43-44, Plaintiff's response, p. 112.)
In the present case, the community spouse died before the institutionalized spouse requested a fair hearing to contest her eligibility of benefits. A hearing was then held to determine if the community spouse's income should be increased in order to meet his MMNA, at which time no one informed the FHO that Adolfo Costa was dead. The FHO's ensuing decision was based on the premise that Adolfo Costa was still alive and she granted Adolfo Costa an increase in his CSPA, due to the insufficiency in his monthly income "provided all other eligibility factors have been met." (ROR, May 19, 1999 Hearing Decision, p. 4.). Once the complete set of facts was established it was reasonable for the FHO to conclude that the community spouse had no unmet needs.
Given the policy behind the MCCA, the court finds that the FHO was correct in rendering her corrected reconsidered decision. As previously indicated, "[t]he legislative history of the MCCA establishes that Congress sought to end the pauperization of community spouses by assuring that the community spouse has a sufficient — but not excessive — amount of income and resources available to her while her spouse is in a nursing home. H.R. Rep. No. 100-105 (II), 100th Cong., 2d Sess. at 65 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 888." (Internal quotation marks omitted.) O'Callaghan v. Commissioner of SocialServices, supra, 53 Conn. App. 211. Here, the plaintiff did not establish CT Page 10588 that the community spouse had insufficient resources during his lifetime. Only when a community spouse requires income generated by the institutionalized spouse's share of the couple's assets to meet his MMNA is the FHO authorized to increase the CSPA.[10] In this case, the FHO concluded the community spouse had sufficient income and resources to meet his needs in the community from the date of the plaintiff's institutionalization to the time of his death and had no need for an increased CSPA. (ROR, April 19, 2000 Corrected Reconsidered Decision, pp. 12-16.)
The plaintiff also argues that her first opportunity to be heard, eight months after her application for benefits, was untimely. However, the record discloses that the plaintiff waited approximately six months from the time she applied for benefits to request a hearing. DSS could not conduct the hearing until it was requested by the plaintiff, and once she requested the hearing it was held within two months.
The plaintiff also claims that, pursuant to General Statutes §17b-61,[11] the FHO officer was mandated to issue an opinion within 60 days and her failure to do so invalidates the decision. The defendant argues that the term "shall" is directory and not mandatory. It has been held that "the time period for the hearing officer to render a decision is not mandatory but directory" and that an "untimely decision is not void." Reynolds v. Dept. of Social Services, Superior Court, judicial district of Litchfield, Docket No. 79927 (June 9, 2000, DiPentima, J.) (27 Conn.L.Rptr. 303). In support of this proposition, the court quotedAngelsea Productions, Inc. v. Commission on Human Rights Opportunities, supra, 236 Conn. 681, for the proposition that "the use of the word `shall' though significant, does not invariably establish a mandatory duty." The court emphasized, "[t]here are other considerations in determining the intent of the legislature as to whether the time period for rendering a decision under § 17b-61 is mandatory so that noncompliance would invalidate the action." In addition, it has been held that, "[Section] 17b-61 is silent as to the effect of a decision rendered beyond the sixty day period. No penalty is imposed. The statute does not provide that the failure to render a decision within the specified time entitles the person to an automatic granting of the relief sought. The statute appears to be designed to promote convenience, efficiency and dispatch in the rendering of decisions." Lucas v. Dept. of SocialServices, Superior Court, judicial district of New Britain, Docket No. 488956 (July 21, 2000, Hartmere, J.).
The FHO did not compromise the purpose of the statute by failing to render a decision within sixty days of closing the record. This court agrees that the time period for rendering a decision is merely directory. Here, particularly, the FHO was justified in taking an CT Page 10589 extended period of time to render her decision in light of the plaintiff's nondisclosure of the community spouse's actual status.
The court finds that, based upon the law and the substantial evidence in the record, the FHO's conclusion that the community spouse had no unmet needs and did not warrant an increased CSPA was not unreasonable, arbitrary, illegal, or in abuse of its discretion. Furthermore, the court finds that the plaintiff was accorded the appropriate due process under the circumstances presented.
3. DSS's Conduct Denied the Plaintiff Equal Protection Under the Law
In this appeal the plaintiff also alleges a violation of her constitutional right to equal protection under law. (Plaintiff's Brief, p. 27.) The plaintiff argues that she has a fundamental right to appropriate medical care. She further maintains that DSS has failed to "correct the disparities amongst applicants whose marital status changes while applying for assistance and that those whose status remains consistent." (Plaintiff's Brief, p. 29.) DSS contends that the plaintiff fails to state an equal protection violation, and that her claims are merely an expression of dissatisfaction with the FHO's decision "cloaked in constitutional language." (Defendant's Brief, p. 19.) It further contends that these arguments were not asserted at the agency and should not be raised before the court.[12] (Defendant's Brief, p. 19.) Specifically, DSS argues that medical care is not a fundamental right in Connecticut, the government has no affirmative right to provide minimal subsistence to the poor and that the FHO's consideration of Adolfo Costa's death was entirely relevant to her decision and did not constitute marital discrimination. (Defendant's Brief, pp. 19-21.)
 The concept of equal protection [under the state and federal constitutions] has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . When, as here, a claimed equal protection violation arises from the alleged selective application of a facially neutral state regulation, it must be shown that (1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person. (Citations omitted; CT Page 10590 internal quotation marks omitted.)
Hunt v. Prior, 236 Conn. 421, 443, 673 A.2d 514 (1996).
The plaintiff cites to Doe v. Maher, 40 Conn. Sup. 394, 515 A.2d 134
(1986), in support of her equal protection argument. In Doe, the court found the state of Connecticut was obligated to fund all medically necessary abortions for poor women. Contrary to the plaintiff's assertions, the court did not hold that indigent people have a fundamental right to medical care. Furthermore, in Moore v. Ganim,233 Conn. 557, 660 A.2d 742 (1995), the court held that the state did not have an obligation to provide indigent persons with a minimum level of subsistence or to provide substantial benefits to all citizens in need.
The plaintiff also cites to Sheff v. O'Neill, 238 Conn. 1, 678 A.2d 1267
(1996) in support of her argument. Briefly stated in Sheff, the court held that a disparity existed amongst school districts and the state's failure to address the disparities of the school children's education opportunities was an equal protection violation. The disparity alleged by the plaintiff here does not rise to the level addressed by the court inSheff. In this case the opportunity at issue is whether the estate of Adolfo Costa is entitled to a greater share of the couple's marital assets for the potential distribution to his heirs, not the education of children.
The court finds that the plaintiff has failed to demonstrate that her right to equal protection under the law was violated. There is no evidence in the record indicating that DSS sought to discriminate against the plaintiff or that her application for benefits was evaluated in a discriminatory manner.
4. DSS Denied the Plaintiff's Application Based on Policy Which Had Not Been Promulgated in Accordance with the UAPA
The plaintiff contends that her application for Title XIX benefits was denied based on a policy that had not been promulgated in accordance with the UAPA, had no basis in the administrative regulations and therefore cannot be enforced. (Plaintiff's Brief, p. 30, et seq.) DSS responds that the FHO's decision was not a regulation and that the FHO's decision stemmed from UPM § 1570.25[13] which grants her the authority to increase the CSPA. (Defendant's Brief, p. 21.)
 The criteria that determine whether administrative action is a regulation are neither linguistic nor formalistic. It is not conclusive that an agency has, or has not, denominated its action a regulation or CT Page 10591 that it has, or has not, promulgated it procedurally in the fashion that would be required of a regulation. . . . The test is, rather, whether a rule has a substantial impact on the rights and obligations of parties who may appear before the agency in the future . . . Implicit in this formulation is the recognition that a regulation must be a rule of sufficient generality to impinge substantially on others who will deal with the agency at a future time. (Citations omitted; internal quotation marks omitted.)
Maloney v. Pac, 183 Conn. 313, 325-26, 439 A.2d 349 (1981).
Contrary to the plaintiff's assertions, the FHO's reconsidered decision was not "misguided," did not "[fly] in the face of relevant and controlling provisions" nor did she exercise a "blatant disregard for the law." (Plaintiff's Brief, p. 31.) Rather, the FHO executed her duty pursuant to UPM § 1570.25 and properly concluded that Adolfo Costa did not require additional assets to produce a sufficient income to meet his MMNA. Furthermore, the FHO's final decision is commensurate with the public policy surrounding the MCCA, which is to prevent a community spouse from becoming impoverished when his or her spouse becomes institutionalized and not to preserve a couple's assets to be passed along to future generations. The FHO's decision was not a general rule that would substantially impinge on others that interact with the agency in the future, rather it was merely an assessment of the specific factual situation surrounding the plaintiff's application. Therefore, the court finds for DSS on this issue.
5. DSS Committed Marital Discrimination in Violation of General Statutes § 46a-64
The plaintiff argues that "the hearing officer revoked her prior fair hearing decision based in part, on the notion that a change in an applicant's marital status, although irrelevant for purposes of determining eligibility, could be a basis on which to deny an application for assistance." (Plaintiff's Brief, p. 33.) DSS contends that there is no support in the record that the FHO's final decision violated the Connecticut Public Accommodations Act by discriminating against Nancy Costa because of her change in marital status. (Defendant's Brief, p. 22.) General Statutes § 46a-64 provides that:
 (a) It shall be a discriminatory practice in violation of this section: (1) To deny any person within the jurisdiction of this state full and equal CT Page 10592 accommodations in any place of public accommodation, resort or amusement because of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, mental retardation, mental disability or physical disability, including, but not limited to, blindness or deafness of the applicant, subject only to the conditions and limitations established by law and applicable alike to all persons; (2) to discriminate, segregate or separate on account of race, creed, color, national origin, ancestry, sex, marital status, age, lawful source of income, mental retardation, mental disability, learning disability or physical disability, including, but not limited to, blindness or deafness. . . .
There is no evidence to support the plaintiff's assertion that DSS's application processing procedures are discriminatory in nature. The FHO's decision in this specific instance was based on a determination that there was no longer a need for the community spouse to have an increased CSPA. It was not based on Nancy Costa's change in marital status. Accordingly the court finds for DSS on this claim of error.
 VI. CONCLUSION
The trial court's role on appeal is not to substitute its own judgment for that of DSS or to retry the case. Instead, the court must sustain the agency's factual determinations and affirm its decision if there is substantial evidence in the record taken as a whole to support it.Newtown v. Keeney, 234 Conn. 312, 319-20, 661 A.2d 589 (1995). After review of the record and consideration of the arguments of the parties, this court finds that the record contains substantial evidence to support the FHO's findings. "The question is not whether the trial court would have reached the same conclusion but whether the record . . . supports the action taken." Hospital of St. Raphael v. Commission on Hospitals andHealth Care, 182 Conn. 314, 318, 438 A.2d 103 (1980). In addition, this court finds that the FHO correctly applied the law to the facts. "Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." O'Callaghan v. Commissioner of Social Services, supra,53 Conn. App. 203 (1999), quoting Burinskas v. Dept. of Social Services,
supra, 240 Conn. 146-47.
The goal of the MCCA is to protect the community spouse from the hardship and indignity of poverty. This body of law was created specifically to enable the spouse to have adequate income and resources to CT Page 10593 live independently in the community. The "fundamental objective is to ascertain and give effect to the apparent intent of the legislature."State v. Burns, 236 Conn. 18, 22, 670 A.2d 851 (1996). Furthermore, "[i]f a statute is capable of two constructions, one that is rational and effective in accomplishing the evident legislative object, and the other leading to "bizarre results' destructive of that purpose, the former should prevail." Id., 23. The MCCA was not promulgated for estate planning purposes or to shelter assets for heirs. The FHO's reconsidered decision recognizes and embodies these fundamental principles.
Accordingly, the April 19, 2000 corrected reconsidered decision is affirmed and the appeal is dismissed.
BY THE COURT:
Peter Emmett Wiese, Judge